For Plaintiff: J. J. Cunningham.
For Defendant: J. J. Richards.

---

## SUPERIOR COURT

Anchor Sawmills Company
vs. }No.59328
Shambow Shuttle Co. Inc.

RESCRIPT

February 18, 1925

CAPOTOSTO, J. In an action of contract the plaintiff received a verdict of $2208.33. The defendant moves for a new trial urging the usual grounds.

The issue betwen the parties involves the non-acceptance by the defendant of a car-load of shuttle blocks claimed to have been sold by the plaintiff to the defendant. The case turns principally upon the interpretation to be placed upon a letter said to embody the terms of the agreement signed by the defendant through Mr. Ullman, its vice-president, on June 8, 1923.

The letter in question, identified in this case as Plaintiff's Exhibit 3, reads

in part as follows:

"Dear Mr. Tatem: In accordance with our conversation this morning at our office we are placing order with you for dry persimmon and dogwood blocks under the following conditions: We will accept blocks (persimmon) at 25c per board foot and we hand you herewith our standard sizes. Any blocks which you may have which are other than these sizes, we will agree to take at the nearest standard sizes and the number of board feet in the block to be figured at 25c per board foot. We also hand you herewith our standard sizes on dogwood blocks and we agree to take all of the blocks that you have at the following prices per board foot. * * * * * These blocks are sold to us subject to our inspection at Putnam * * * * * We will send an inspector and his assistant to you when you advise us that the blocks are ready for inspection and you agree to give him certain labor as is necessary for counting and loading."

The parties disagree as to the quantity of persimmon and dogwood respectively which was covered by the contract. The plaintiff claims that the defendant, after some preliminary conversation, bought all the stock of persimmon and dogwood then in its agent's, Mr. Tatem's, storehouse at Putnam, Connecticut, which conformed with the standards given and was accepted by the defendant's inspector. The defendant, on the other hand, maintains that the amount of dogwood and . persimmon blocks which it purchased was represented, within a possible variation of 10 per cent. by a stock sheet of the plaintiff, identified as Plaintiff's Exhibit 1 and Defendant's Exhibit D, and that the carload of blocks as consigned to the defendant did not constitute a substantial compliance with the contract.

In view of this conflict the construction, at least by conduct, placed by the parties upon the agreement which they had made becomes of the utmost importance. Mr. Tatem, testifying for the plaintiff, in relating what happened said, in substance, that when he first began to talk to Mr. Ullman about his merchandise he had in his possession two stock sheets (Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2) and that after some short consideration of the items contained on said stock sheet, they were put aside and a bargain price was fixed for all the shuttle blocks usable by the defendant then in his storehouse at Putnam. The defendant, through its vice president Mr. Ullman, in effect testified that the contract was entered into in reliance upon the contents of one stock sheet (Plaintiff's Exhibit 1), which was the only one shown him, and that if it had not been for the fact that a considerable quantity of dogwood blocks appeared on that sheet, which he was anxious to secure, he would not have entered into the contract at all.

Harold T. Rhodes, the person chosen by the defendant company to take care of the selection, inspection and shipping of the blocks at Putnam, testifying for the defendant, said that on the day the agreement was made Mr. Ullman showed him the contract (Plaintiff's Exhibit 3) and gave him special instructions as to resizing; that at that time he was not shown any stock sheets nor was he told anything as to the amount or kind of blocks to be inspected; that he was asked by Mr. Ullman if he understood the order and that he answered that he did.

Several weeks afterwards Mr. Rhodes, having a copy of the letter in his possession, went to Putnam and proceeded to select, inspect and load into a freight car the persimmon and dogwood blocks of usable sizes in

Mr. Tatem's storehouse. When this car had been completely loaded, closed and sealed, another freight car consigned to Mr. Tatem from some southern point arrived at Mr. Tatem's place of business. Mr. Rhodes, on learning the contents of this second car and believing that Mr. Ullman would be interested because of the quantity of dogwood which it contained, immediately brought the matter to Mr. Ullman's attention by telephone and was instructed to secure from Mr. Tatem the dogwood in the second car. Although this dogwood had already been promised if not actually sold to the U. S. Bobbin Company, Mr. Tatem finally agreed to let Mr. Rhodes have the dogwood in this second car for the defendant corporation. Meanwhile the car which contained Mr. Rhodes' original selection, hereinafter designated as car number one for convenience, was returned by the railroad company because overloaded. Mr. Rhodes, thereupon, without disturbing the dogwood, first unloaded from car number two all the persimmon blocks which had recently arrived in that car, and then proceeded to replace what he had taken out by blocks of both persimmon and dogwood taken either from car number one or from Mr. Tatem's storehouse.

Mr. Rhodes further testified that, after car number one had been loaded and sealed, he sent a copy of the checked list of the contents of that car to Mr. Ullman; that Mr. Ullman a day or so later sent him a stock sheet, marked Defendant's Exhibit D, (apparently a duplicate of Plaintiff's Exhibit 1), with instructions not to ship car number one because it did not conform with his agreement with Mr. Tatem, and to proceed to make up a car from the contents of car number two which would come somewhere near the list which he enclosed. This was the first time, according to Mr. Rhodes, that he had ever seen that stock sheet or any duplicate thereof.

The testimony then proceeds to detail the efforts that were made by Mr. Tatem to reach Mr. Ullman for an explanation of the defendant's action, his inability to do so, the reasons for and ultimate rejection of car number one after it reached Woonsocket, and its subsequent sale to a third party. The resulting loss to the plaintiff is the subject of this suit.

Turning for a moment to the letter in question we find that although it was prepared by the defendant's own agent, Mr. Ullman, no mention is made anywhere in it of any stock sheets, nor is any limitation of quantity or quality indicated therein. It is conceded by both sides that the stock at the time the agreement under discussion was made was the stock then in existence at Mr. Tatem's storehouse in Putnam, Connecticut. The contents of car number two were unknown to Mr. Ullman when this contract was entered into. Mr. Ullman, by his written statement at least, agreed to take "any blocks" of persimmon which Mr. Tatem then had at a flat rate of 25c per board foot, and "all the blocks" of dogwood then in Mr. Tatem's possession at a scheduled rate of prices per board foot according to sizes.

The wording of the letter of June 8 is more consistent with the view advanced by the plaintiff than the one urged by the defendant. It is difficult to imagine that a person of Mr. Ullman's business experience would have omitted referring to a stock sheet, which he now claims was the very basis of the agreement, either by incorporation or at least by reference. Failing to do this, it is hard to believe that he would overlook making at least a general statement of the approximate quantity of

each kind of blocks he was contract-ing for.

Assuming, however, that the loose wording of the letter of June 8 was due to inadvertence, let us see what the defendant did in carrying out the agreement which the parties had entered into. Mr. Rhodes, who was called into Mr. Ullman's office shortly after this letter was signed and while Mr. Tatem was still present, was shown either the original or a copy of the letter and nothing more. The stock sheet which has now become so important was neither shown to Mr. Rhodes nor even referred to by Mr. Ullman in his instructions to his inspector. Two or three weeks later, when Mr. Rhodes went to Putnam to inspect the stock, he had with him as his sole guide a copy of the letter of June 8. Again the stock sheet, which, according to the defendant, was to be the basis of the selection to be made by its agent, was conspicuous by its absence. This conduct could hardly be explained as an oversight. It is such action which throws considerable light upon what the understanding between the parties really was.

Going a step further, we find Mr. Rhodes inspecting, selecting, and counting the entire stock of both persimmon and dogwood blocks fit for use by his company which he found in Mr. Tatem's storehouse. It is not until Mr. Ullman is informed by his agent of the arrival of a second car at Mr. Tatem's siding containing a considerable quantity of dogwood that Mr. Ullman discovers that the car as reported loaded by Mr. Rhodes was not in conformity with a certain stock sheet of the plaintiff in his possession (Plaintiff's Exhibit 1 and Defendant's Exhibit D). He then, for the first time, sends Mr. Rhodes either the original or a copy of the stock sheet in question with instructions to make up a car from the contents of car number two somewhere near the list which he then forwarded. This sudden change is inconsistent with the prior conduct of the defendant in dealing with the subject matter at issue. Whether or not the more desirable contents of car number two was the real cause of the defendant's activity may never be known but it certainly was the beginning of a course of conduct quite at variance with what had preceded.

The unbusinesslike method adopted by the defendant in rejecting car number one shows at least an indefinite state of mind as to what grounds the defendant really relied upon to justify its conduct.

Construing then the letter of June 8, 1923, in the light of the surrounding circumstances and the subsequent conduct of the parties, the Court is of the opinion that the jury was amply justified in reaching the conclusion that the defendant's position was more in the nature of an afterthought rather than an accurate representation of what actually occurred between the parties and that the plaintiff was entitled to recover such damages as it had suffered by the unwarranted action of the defendant.

Motion for new trial denied.

For plaintiff: Hinckley, Allen, Tillinghast and Phillips.

For defendant: M. W. Crane and W. A. Gunning.